Marie **PIERRE** et al., Petitioners-Appellants,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 75–3975.

United States Court of Appeals,
Fifth Circuit.

March 7, 1977.

Rehearing and Rehearing En Banc
Denied April 12, 1977.

See also, 5th Cir., 525 F.2d 933.

Eric M. Lieberman, New York City (Michael Krinsky, Dorian Bowman, Ira I. Gollobin, New York City, Neal R. Sonnett, Donald I. Bierman, Miami, Fla., of counsel), for petitioners-appellants.

Robert W. Rust, U. S. Atty., Miami, Fla., Rex L. Young, Atty., Gov. Reg. Sec., James P. Morris, Philip Wilens, Acting Chief, Crim. Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before AINSWORTH and CLARK, Circuit Judges, and HUGHES,* District Judge.

AINSWORTH, Circuit Judge:

This is an immigration case involving the appeal of a number of Haitian aliens who claim asylum in the United States as political refugees. Petitioners, 147 Haitian nationals who admit their excludability under 8 U.S.C. § 1182(a)(20) (lack of appropriate documentation), requested parole into the United States under section 1182(d)(5) as political refugees as defined in the United Nations 1967 Protocol and Convention Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. 6557. The Immigration and Naturalization Service [INS] denied parole and petitioners brought this habeas corpus action in United States District Court. Relief was denied but we remanded the case on motion of petitioners to allow them to

* Senior District Judge for the Northern District of Texas, sitting by designation.

provide INS with additional material concerning their status. When none was forthcoming this cause was "returned" to us by the District Court.

On this appeal petitioners assert statutory and constitutional rights which they contend accrue to them by operation of the Protocol; further, they assert a denial of due process by the INS, and argue that INS procedures for considering refugee applications are inadequate and that new procedures should be required. We affirm the District Judge's denial of the habeas corpus petition.

Petitioners were among 216 Haitians who left their country in small groups by boat, during 1972 and early 1973. Upon arriving at United States ports all immediately were taken into the custody of immigration officers without having made "entry."[1] They were then examined by immigration officers in accordance with section 235 of the Immigration and Nationality Act, 8 U.S.C. § 1225, which provides in pertinent part:

> All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. . . .
> Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other

items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 1182 of this title.

Examination by immigration officers of these Haitians revealed that each of the petitioners sought to enter the United States without appropriate entry documents. This lack of documents brought them within the terms of 8 U.S.C. § 1182(a)(20), which provides in pertinent part:

> Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
>
> .    .    .    .    .
>
> (20) Except as otherwise specifically provided in this chapter, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General pursuant to section 1181(a) of this title; .    .    .    .

Despite the plain language of the statute the Attorney General or his delegate can exercise discretion to parole excludable aliens into the United States, 8 U.S.C. § 1182(d)(5).[2] The parole power has been

---

1. Section 101(a)(13) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(a)(13), provides:
   The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no person whose

departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.

2. 8 U.S.C. § 1182(d)(5) provides:
   The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was

exercised to grant refuge to aliens who would be subject to persecution on account of race, religion or political opinion if excluded and returned to his country of origin. The asylum policy of the United States is reflected in our accession to the Protocol. Article 33 of the Protocol provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

The Protocol adopts as its definition of "refugee" that contained in the United Nations 1951 Convention Relating to the Status of Refugees, as follows:

> A. For the purposes of the present Convention, the term "refugee" shall apply to any person who:
>
> .    .    .    .    .
>
> (2) As a result of events occurring before 1 January 1951 and owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is

unable or, owing to such fear, is unwilling to return to it.

(The Protocol specifically deletes the reference to 1 January 1951.) Department of State Public Notice 351, "Requests for Asylum," 37 F.R. 3447 (Feb. 16, 1972) provides that "A primary consideration in U.S. asylum policy is the 'Protocol Relating to the Status of Refugees,' to which the United States is a party." The Notice also contains the following statement:

> *Policy.* Both within the United States and abroad, foreign nationals who request asylum of the U.S. Government owing to persecution or fear of persecution should be given full opportunity to have their requests considered on their merits. The request of a person for asylum or temporary refuge shall not be arbitrarily or summarily refused by U.S. personnel.

The Haitian petitioners in this case requested asylum in light of this policy, in the form of "applications for refugee status." The administrative regulations in effect at the time of the applications, found at 8 C.F.R. (1974), provide at section 103.1(f) that the Attorney General's authority under the immigration laws to grant or deny "any application or petition submitted to the Service" is delegated to district directors of the INS.[3] 8 C.F.R. § 212.5(a) further provides that district directors "may" parole aliens into the United States, "after a finding of inadmissibility has been made"[4] under 8

---

paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

**3.** 8 C.F.R. § 103.1 (1974) provides:

Delegations of authority.

Without divesting the Commissioner of any of the powers, privileges, and duties delegated to him by the Attorney General under the immigration [sic] and naturalization laws of the United States, coextensive authority is hereby delegated to the following described officers of the Service:

.    .    .    .    .

(f) *District directors.* Under the executive direction of a regional commissioner (except district directors outside the United States .   .   .), the grant or denial of any application or petition submitted to the Service, the

initiation of any authorized proceeding in their respective districts  .   .   . .

**4.** 8 C.F.R. § 212.5(a) (1974) provides in pertinent part:

The district director in charge of a port of entry may, prior to examination by an immigration officer, or subsequent to such examination and pending a final determination of admissibility in accordance with sections 235 and 236 of the Act and this chapter, or after a finding of inadmissibility has been made, parole into the United States temporarily in accordance with section 212(d)(5) of the Act any alien applicant for admission at such port of entry under such terms and conditions, including the exaction of a bond on Form I–352, as such officer shall deem appropriate.

U.S.C. § 1182(d)(5). Thus, district directors are delegated the Attorney General's discretionary power to parole inadmissible aliens into the United States. Pursuant to this provision petitioners made application to the appropriate district director for discretionary parole, asserting that they were political refugees.

The INS has promulgated "Operations Instructions" which include instructions for handling asylum applications. The then current instructions provide:

108.1 *Requests for asylum.* (a) *General.* An alien who requests asylum shall be interviewed by an immigration officer and given an opportunity to fully present his case. In every case, detailed facts, including basis for decision and information concerning any subsequent action in the case shall be included in the subject's "A" file.

.    .    .    .    .

(c) *Applicants at seaports or airports in the United States.* An alien who requests asylum at time of application for admission at a seaport or airport of entry, before or during an exclusion hearing, or subsequent to such a hearing, shall be interviewed by an immigration officer to determine the basis for his request. . . In any case in which the District Director does not believe that asylum should be granted and the alien does not withdraw his request, the District Director shall furnish full particulars by letter to the Office of Refugee and Migration Affairs, Department of State. Action to enforce departure shall not be taken in the alien's case until the views of that office have been received and considered by the District Director.

This procedure was followed, as appears in the record, and each of the petitioners was notified by the district director that, in his judgment after consultation with the State Department, they were not subject to political persecution upon return to Haiti. Accordingly, political refugee status and "temporary refuge"—presumably meaning parole—was denied. Each petitioner was then afforded a hearing under 8 U.S.C. § 1226 which provides:

*Exclusion of aliens—Proceedings*

(a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 1225 of this title shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be based only on the evidence produced at the inquiry. No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 1225 and 1357(b) of this title, and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. At such inquiry, which shall be kept separate and apart from the public, the alien may have one friend or relative present, under such conditions as may be prescribed by the Attorney General. A complete record of the proceedings and of all testimony and evidence produced at such inquiry, shall be kept.

*Appeal*

(b) From a decision of a special inquiry officer excluding an alien, such alien may take a timely appeal to the Attorney General, and any such alien shall be advised of his right to take such appeal. . . .

*Finality of decision of special inquiry officers*

(c) Except as provided in subsections (b) or (d) [physical and mental defects] of this section, in every case where an alien

is excluded from admission into the United States, under this chapter or any other law or treaty now existing or hereafter made, the decision of a special inquiry officer shall be final unless reversed on appeal to the Attorney General.

Petitioners' cases were each heard by a special inquiry officer, or Immigration Judge. In each case the Haitians were represented by counsel; transcripts of the hearings appear in the record along with transcripts of the Immigration Judges' oral opinions. In each case petitioners were found to have no basis for entry into the United States. The Immigration Judges uniformly noted that they lacked jurisdiction to review the refusal of refugee status and discretionary denial of parole, such discretion having been vested exclusively in the district directors. Under these circumstances each Haitian was found excludable and ordered deported.

The Attorney General has delegated his appellate jurisdiction over exclusion and deportation hearings to a Board of Immigration Appeals, 8 C.F.R. § 3.1(b)(1) (1974).[5] Each of the petitioners appealed his order of exclusion and deportation to the Board, and each appeal was dismissed, after oral argument by counsel.

Judicial review of final orders of exclusion promulgated pursuant to 8 U.S.C. § 1226 is limited to habeas corpus proceedings, 8 U.S.C. § 1105a(b).[6] Upon dismissal of their causes by the Board 147 Haitians filed consolidated habeas petitions in United States District Court on October 29, 1973. A hearing was held November 21, 1973. Additional Haitians were added later on stipulation that orders would bind all, bringing the total number of petitioner Haitians to 216. On December 28, 1973, the Haitians' petition was denied by the District Judge and notice of appeal to this

Court was filed. On October 1, 1974, on the petitioners' motion, the cause was remanded to the District Court. The INS had agreed to reconsider the applications for asylum on the basis of affidavits or other new material, which the petitioners offered to submit to the INS. On January 20, 1975, the District Judge remanded the cause "for further administrative review of the petitioners' claims for political asylum to the Immigration and Naturalization Service." The order concludes, "Until such time as the petitioners' administrative remedies are exhausted, this cause be and the same hereby is DISMISSED." On January 24 the District Judge promulgated a "Clarification of Order of Remand" providing that the orders of expulsion outstanding against the Haitians be stayed "until such time as their Administrative remedies are exhausted and they have had an opportunity to seek review in this Court and in the United States Court of Appeals for the Fifth Circuit." On January 29 the Government filed a motion noting that only 23 of the 216 Haitians had submitted new material to the INS, and requesting that the District Judge amend his order of remand to include only those 23. An exchange of filings followed, and on March 4 the District Judge "expanded" his orders of January 20 and 24 to the effect that

For purposes of further administrative review, the petitioners' [sic] are to be considered as one class in their pursuit of political asylum in the United States of America, even though all of the petitioners have not supplemented their records made at initial interview with agents of the Immigration and Naturalization Service.

In administrative review of the petitioners' claim for political asylum, the Immigration and Naturalization Service

---

5. 8 C.F.R. § 3.1 contains the following:

   (b) *Appellate jurisdiction.* Appeals shall lie to the Board of Immigration Appeals from the following:

   (1) Decisions of special inquiry officers in exclusion cases, as provided in Part 236 of this chapter.

6. 8 U.S.C. § 1105a(b) provides:

   Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 1226 of this title or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.

should follow existing procedures, if adequate, and new procedures, if necessary, to afford the petitioners an opportunity to be heard (orally or in writing) on their claims for political asylum . . . .

On May 2, 1975, the Government submitted another motion to the District Judge noting that 69 of the Haitians had submitted new materials to INS, that no administrative reconsideration could be taken respecting those not submitting new material, that a stay of deportation order remained in effect regarding the 147 who had not submitted new material pending exhaustion of appeal through the Fifth Circuit but that since they could not be deported they had no motivation to appeal. The Haitians replied through counsel that there were substantial "practical and financial difficulties [in] obtaining new affidavits from every petitioner" and that "the [69] affidavits actually obtained were meant to be *representative* of petitioners as a class." [Emphasis in the original.] A hearing on the Government's motion was held, and on August 7 the District Judge issued an "Order of Severance and Dissolution of Stay." The order noted that 147 Haitians had failed to submit new materials to the INS, and ordered them severed from the group of 216. The order then noted that the INS determinations of excludability of the 147 had already been upheld by this District Court so that "In the opinion of this Court, further review by this Court would not be required by the Order of Remand issued by the United States Court of Appeals for the Fifth Circuit, for there has been no further action as to the members of said sub-class by the Immigration and Naturalization Service." The District Judge ordered the 147 severed and the stay of deportation dissolved as to them. On September 8 the District Judge issued an "Amended Order of Severance and Dissolution of Stay," apparently based upon the same government motion of May 2 and responsive filings on which the August 7 order was based. The District Judge in his September 8 order reiterated the severance of the 147 and his affirmance of the INS determination of excludability. He further ordered the cause

of the 147 "returned to the Fifth Circuit Court of Appeals since the purpose of the Order on the Mandate has been fulfilled by this Court." The District Judge reinstated the stay of deportation as to the 147 pending appeal to this Court.

On October 2 the Government filed a motion requesting that the stay be lifted, arguing that "the INS is enjoined from taking any action on an order of deportation which had been affirmed by this Court and the 147 petitioners are under no compulsion to do anything other than enjoy the *status quo.*" That same day, October 2, the District Judge issued an "Order Upon Motion for Relief of Order of Judgment" ordering the 147 Haitians to "renew their cause before the Court of Appeals for the Fifth Circuit on or before October 22, 1975." On October 22 the Haitians by their counsel duly filed in this Court an appeal which they characterize as "an appeal from an order of the district court in effect dismissing the action with respect to 147 of the 216 petitioners herein, and directing said 147 petitioners 'to renew their cause before the Court of Appeals for the Fifth Circuit.'"

The effect of the proceedings which we have detailed has been to sever the cause of the 147 petitioners from the rest of the group so that the earlier denial of the habeas corpus petition as to these 147 remains in force.

On appeal petitioners contend that the INS and the District Court misconstrue the effect of the Protocol on the statutory immigration scheme. They argue that on the one hand article 33 of the Protocol permits the INS no discretion to exclude bona fide refugees; and that on the other hand the Protocol vests in all potential refugees a liberty right or expectation protectable under the due process clause of the fifth amendment to the United States Constitution, *cf. Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Neither contention has merit.

The legislative history of United States accession to the Protocol shows that the State Department, in presenting the Protocol to the Senate for ratification, believed

that the Protocol would require no changes in the current administration of immigration policy: Lawrence Dawson, Acting Deputy Director of the Office of Refugee and Migration Affairs of the State Department, testified to this effect before the Senate Foreign Relations Committee when that committee was conducting hearings concerning the Protocol:

[A]ccession does not in any sense commit the contracting state to enlarge its immigration measures for refugees. Rather, the asylum concept is set forth in the prohibition against the return of a refugee in any manner whatsoever to a country where his life or freedom would be threatened; and the prohibition under Article 32 against the deportation of a refugee lawfully in the territory of a Contracting State to any country except in cases involving national security or public order. The deportation provisions of the Immigration and Nationality Act, with limited exceptions, are consistent with this concept. *The Attorney General will be able to administer such provisions in conformity with the Protocol without amendment of the Act.* [Emphasis added.] [Appendix 90th Cong., 2d Sess., Executive Report No. 14, Protocol Relating to Refugees, September 30, 1968, at 6.]

During those hearings the following exchange took place between Deputy Director Dawson and Senator Sparkman:

Senator Sparkman: I want to make certain of this: Is it absolutely clear that nothing in this protocol, first, requires the United States to admit new categories or numbers of aliens?

Dawson: That is absolutely clear.

. . . . .

Senator Sparkman: And no requirement of new categories or numbers of aliens?

Dawson: That is correct, sir. [*Id.*]

When the Committee submitted the Protocol to the Senate Senator Mansfield stated, "It is understood that the Protocol would not impinge adversely upon the Federal and State laws of this country." 114 Cong.Rec. 12,021 (Oct. 3, 1968).

The Board of Immigration Appeals thoroughly reviewed the statutory history of the Protocol in Matter of Dunar, B.I.A. Interim Decision No. 2192 (April 17, 1973). The Board concluded that

the United States Senate, in giving its advice and consent to accession to the Protocol, did not contemplate that radical changes in existing immigration laws would be effected. Quite the contrary, the general representations made to induce affirmative Senate action indicated that our immigration laws already embodied the humane provisions for refugees fostered by the Convention and Protocol. [Matter of Dunar, B.I.A. Interim Decision No. 2192 (April 17, 1973).]

The Courts of Appeals for the Second and Third Circuits have reached similar conclusions. *See Ming v. Marks,* S.D.N.Y., 1973, 367 F.Supp. 673, 677–78, aff'd, 2 Cir., 1974, 505 F.2d 1170; *Kan Kam Lin v. Rinaldi,* D.N.J., 1973, 361 F.Supp. 177, aff'd, 3 Cir., 1974, 493 F.2d 1229, *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 113 (1974).

■ We agree with these conclusions and determine accordingly that accession to the Protocol by the United States was neither intended to nor had the effect of substantively altering the statutory immigration scheme. From this determination we draw two conclusions: that no new rights or entitlements were vested in these petitioners by operation of the Protocol, and that the procedures by which the INS determines refugee status were not invalidated.

■ Petitioners' contention that the Senate's accession to the Protocol vested in aliens a United States constitutional entitlement accompanied by a full array of constitutional protections flies in the face of the legislative history just reviewed. This is just the sort of "radical change" in our immigration laws which the Senate did not intend. The entire immigration scheme would be nullified if any alien desiring entry could demand the full process of the courts to adjudicate his refugee status, merely by appearing at our shores and proffering assertions of status of the nature of those in this case. Therefore, we reject

petitioners' contention that the Protocol invests them with a liberty right protectable by due process or other constitutional protections.

■ We also reject petitioners' contention that the INS procedures for determining refugee status are inadequate in light of the terms of article 33 of the Protocol, and that the Protocol creates an "absolute right" against return of a bona fide refugee to a country in which he fears political persecution. Petitioners' assertion fails to consider that asylum results from a two-part determination. First a determination whether the applicant is a bona fide refugee must be made. Under existing statutes the Attorney General then has discretion whether to parole the refugee into the United States. We need not decide whether the Protocol deprives the Attorney General of discretion regarding parole once refugee status is affirmatively determined because petitioners before us failed the first part of the test. The INS, in consultation with the State Department, determined that they were not bona fide refugees. It is clear from the terms of the Protocol itself that an applicant for asylum must fit the definition of bona fide refugee before he can take relief from the terms of the Protocol. Because the Protocol contained no procedures for making this determination, and because Congress saw fit at the time of accession to leave existing procedures unchanged, we conclude that it was the intent of Congress that existing procedures be followed. These procedures were followed with respect to petitioners' applications for refugee status in this case. This discretionary judgment of a political department is reviewable by us only for abuse of discretion, *Kleindienst v. Mandel,* 408 U.S. 753, 769–70, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972). The burden was on petitioners to show the INS that they were refugees, *see Paul v. INS,* 5 Cir., 1975, 521 F.2d 194. To carry this burden an alien must show a "clear probability" of persecution, *Cisternas-Estay v. INS,* 3 Cir., 1976, 531 F.2d 155, 159; *see Gena v. INS,* 5 Cir., 1970, 424 F.2d 227, 229–30.

■ The present petitioners provided, at best, unsubstantiated and ambiguous claims of conflicts with government authorities in Haiti. The Office of Refugee and Migration Affairs advised the INS that in its judgment these petitioners did not face political persecution on their return to their homes, and that in many cases the Haitian Government appeared to be unaware of them. On this basis petitioners were denied refugee status. Given a second opportunity to submit information or evidence bearing on their status petitioners were unable or unwilling to provide it. On this record we cannot say that a "clear probability" of persecution was shown. Therefore, the INS did not abuse its discretion in refusing refugee status to the petitioners, and the District Judge correctly so found. *See Gena, supra,* 424 F.2d at 232 ["In light of Gena's failure to file new evidence of any kind, we certainly cannot say that the Board's denial of his motion to reopen constituted an abuse of discretion."]; *Daniel v. INS,* 5 Cir., 1976, 528 F.2d 1278, 1279–80 [denial of refugee status to alien who had effected entry, under 8 U.S.C. § 1253(h)]. In short, the Protocol left intact the INS procedure for determining refugee status, and that procedure was followed in this case without abuse of discretion.

■ Petitioners complain that the distinctions between excludable aliens (those seeking "entry" into the United States) and aliens who have made entry, even if illegally, deny the former class equal protection of the law. The differences are substantial, *see Leng May Ma v. Barber,* 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1957); *Maldonado-Sandoval v. United States Imm. and Nat. Service,* 9 Cir., 1975, 518 F.2d 278, 280 n. 3. The Supreme Court, however, has pointed out

> that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality.

*Leng May Ma v. Barber, supra,* 357 U.S. at 187, 78 S.Ct. at 1073. "The distinction was

1290

carefully preserved in Title II of the Immigration and Nationality Act," *id.* That Congress has "plenary . . . power to make policies and rules for exclusion of aliens has long been firmly established." *Kleindienst v. Mandel,* 408 U.S. 753, 769, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972). "Congress has plenary power in the immigration area, particularly in determining *which aliens will be admitted* and the period they shall remain." *Pelaez v. INS,* 5 Cir., 1975, 513 F.2d 303, 305 [emphasis added]. Congress clearly has the power to draw distinctions between classes of aliens which, if drawn among classes of citizens, would appear to violate the equal protection clause or other constitutional rights. As Judge Moore of the Second Circuit (sitting by designation in the Eastern District of New York) has pointed out, aliens

> may be denied entrance on grounds which would be constitutionally suspect or impermissible in the context of domestic policy, namely, race [*Dunn v. INS,* 499 F.2d 856, 858 (9th Cir. 1974)], physical condition [*United States v. Esperdy,* 2d Cir., 1960, 277 F.2d 537, 539], political beliefs [*Mandel, supra*], sexual proclivities [*Boutilier v. INS,* 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)], age [*Nazareno v. Attorney General of the United States,* 1975, 168 U.S.App.D.C. 22, 512 F.2d 936], and national origin [e. g., *Faustino v. INS,* 2d Cir., 1970, 432 F.2d 429, 431].

*Fiallo v. Levi,* E.D.N.Y., 1975, 406 F.Supp. 162, 165.

In light of the established power of Congress to make such distinctions among classes of aliens, the question becomes whether Congress or its delegates abuse that power when making a distinction between the class of aliens who have made entry and those who have not. Clearly constitutional protections cannot be afforded to the entire population of the world, and some distinction is necessary. The distinction in question here has been countenanced in a line of Supreme Court cases acknowledging that aliens who have not

made entry do not enjoy the protections of the United States Constitution. *See Kleindienst v. Mandel, supra,* 408 U.S. at 762, 769–70, 92 S.Ct. at 2581, 2585; *cf. Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 1891–92, 48 L.Ed.2d 478 (1976). The Supreme Court has recently refused to reconsider this line of cases, *Kleindienst v. Mandel, supra,* 408 U.S. at 767, 92 S.Ct. at 2584. As already noted, Congress has reaffirmed the distinction in the Immigration and Nationality Act. We decline to upset this distinction which lies within the jurisdiction of the political branches of government. *Kleindienst v. Mandel, supra,* 408 U.S. at 765, 92 S.Ct. at 2583.

Petitioners' argument that procedural and other distinctions between aliens who have accomplished entry and those who have not works a denial of equal protection, is without merit.

Finally, petitioners contend that the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.,* is applicable to claims for asylum under article 33 of the Protocol, because "constitutional due process requires that a hearing be held" to determine refugee status, bringing the determination within 5 U.S.C. § 554 requiring certain protections in every case of "adjudication required by statute to be determined on the record after opportunity for an agency hearing." As we have shown, petitioners are not entitled to constitutional protections. Further, we have concluded that it was the intent of Congress in acceding to the Protocol to leave existing immigration procedure intact, and this procedure did not, at the time pertinent to this case, require a hearing of the sort requested by petitioners to determine refugee status.

Petitioners' remaining contentions will be seen to be without merit in light of the foregoing. Accordingly, the District Judge's order severing the 147 present petitioners from the group of 216 and reinstating his denial of the habeas corpus petition as to the severed 147 was correct.

AFFIRMED.