Jorge RAMOS, Aniceto Sancio, Julio Cesar Rodriguez, Miguel Martinez Diaz, Jorge Verrier Urria, Rawou Acosta, Felix Gonzalez Gisbert, Cesar Napoles Carreño, Isidoro Moringo Barro, Nicholas Moreno, Arturo Ojeda, Francisco Catala, Lazaro Rodriguez, Secada Jorrin Maximo, Gonzalez Fidel, Ramon Tajes–Rodriguez, Jorge Luis Jardines, Gonzalez Rolando, Jiminez Masso Ricardo, Sergio Torres Quintaña, Orlando Casana Hernandez, Alberto Quintero, Antonio Hernandez Prado, Luis Gonzalez Muñoz, Juan Diaz Corrida, Rolando Gonzalez Martinez, Juan Plaza Perez, Pablo Vila, Julio Antonio Valdes, Alberto Garcia, Angel Benita, Francisco De Dios Blasco, Guillermo Ruiz Garcia, Carlos Cruz Sanchez, Calixco Palacios Fraga, Victor Leyva–Puente, Juan C. Iturraldes, Alberto Sanchez, Carlos Ocaña, Juan Alberto Moya Borrell, Jose Luis Perez, Gregorio Gonzalez, Roberto Leon Morera, Sergio Concepcion Rodriguez, Basilio Madero Aguila, Jose Alvarez Diaz, Alberto Lopez Rubalcaba, Pedro Pablo Perdomo–Reyes, Florentino Navarro Roque, Rangel Hernandez, Juan Morin Lopez, Pablo Berrio, David Small Rodriguez, Rafael Salina, Jose Paul Vargas Gomez, Jorge Gonzalez Querolt, Orlando A. Hernandez, Reinaldo Martinez, Enrique Ramirez Broco, Raul Castellemos Arjons, Jose Abadin, Pedro Martinez Sanchez, Felix Alpizar, Roberto Soler, Gerardo David Cabrera, Lasertes Reynaldo, Marlena Rodriguez, Ernesto Rodriguez Perez, Jorge Garcia, Antonio Ferrer, Eduardo Rivera, Sixto C. Asevedo, Abelardo Piloto Martinez, Davila Izquierdo Ramon, Jose Luis Cardenas, Roberto Diaz, Clorismundo Gonzalez, Gilberto Corso, Armando Alagon, Rodolfo Parra, Julian E. Morthon–Ruiz, Fidel Garcia Torres, Jesus Cruz Perez, Vargas Jiminez, Ricardo Sanchez Patterson, Reinaldo Cuero, Juan Cruz Labrada, Reinaldo Arias Diez, Pedro Alvarez, Ventura Enriquez, Roberto Aguero, Julio Marin Hernandez, Alfredo Cunis, Hector Forcade Brages, Richard Norma Estrada, Reina C. Martinez, Pedro Cordero, Jesus Crespo Carbonell, Roberto Castellon, Pedro Rodriguez Perez, Pedro Hernandez, Jesus Rodriguez Batista, Aleida Perez, Mario Alvarez Molina, Ignacio Rodriguez Salazar, Mario Hernandez Nodarse, Francisco Cabrero Espada, Julio A. Cruz Francisco, Fidel Romero Hernandez, Jose Luis Arguez–Perez, Rafael Paneque, Jose Nuñez–Canales,

v.

Richard THORNBURGH, in his Official Capacity as Attorney General of the United States.

Civ. A. Nos. 90–1244, 90–1246, 90–1249, 90–1251, 90–1252, 90–1255, 90–1281, 90–1282, 90–1307, 90–1309 to 90–1313, 90–1315, 90–1316, 90–1318, 90–1319, 90–1322, 90–1324 to 90–1326, 90–1328 to 90–1330, 90–1340 to 90–1343, 90–1346, 90–1347, 90–1351 to 90–1355, 90–1357 to 90–1361, 90–1363, 90–1365 to 90–1367, 90–1369, 90–1370, 90–1372, 90–1373, 90–1416, 90–1418 to 90–1420, 90–1422, 90–1426, 90–1456, 90–1457, 90–1460, 90–1461, 90–1463, 90–1464, 90–1466, 90–1468 to 90–1470, 90–1473 to 90–1477, 90–1479, 90–1622, 90–1627 to 90–1630, 90–1632, 90–1634 to 90–1637, 90–1639 to 90–1641, 90–1643, 90–1644, 90–1646, 90–1696, 90–1698, 90–1700, 90–1711, 90–1714, 90–1755 to 90–1759, 90–1811, 90–1835, 90–1887, 90–1889, 90–1905, 90–2011, 90–2038, 90–2039 to 90–2041, 90–2126, 90–2183, 91–0147, 90–2796 and 90–2556.

United States District Court,
W.D. Louisiana,
Alexandria Division.

April 12, 1991.

Carl E. Perry, Asst. U.S. Atty., Lafayette, La., for respondent.

RULING

LITTLE, District Judge.

■ Each petitioner is a Cuban national who came to the United States in 1980 during the Mariel boatlift. The Immigration and Naturalization Service detained petitioner upon his arrival at the United States border and eventually decided to exclude him from admission into the country. 8 U.S.C. § 1226. De jure, petitioner has never entered this country. De facto, he is physically present and in the custody of the INS.[1] 8 U.S.C. § 1101(a)(13).

---

1. "Entry" occurs either when an alien crosses the territorial boundaries of the United States and is admitted by an immigration officer or when an alien actually and intentionally evades inspection at the port of entry and is free from restraint any time thereafter. *United States v. Oscar*, 496 F.2d 492, 493–94 (9th Cir.1974); *United States v. Vasilatos*, 209 F.2d 195 (3d Cir.

1954); *Edmond v. Nelson*, 575 F.Supp. 532, 535 (E.D. La.1983). Thus, an alien can be physically present within the borders of the United States and have not made a statutory entry. Such persons are considered legally detained outside the United States. *Jean v. Nelson*, 727 F.2d 957, 969 (11th Cir.1984) (en banc), *aff'd* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Because

Under the statutory scheme, whenever the INS renders a formal order of exclusion, it is to deport the alien to the country of his origin, or failing that, to the country of which he is a citizen, where he was born, where he has a residence, or any country willing to accept the alien. 8 U.S.C. § 1227. Unfortunately, INS has been unable to deport petitioner because Cuba has refused to accept him. Thus, INS has continued to detain petitioner pending either Cuba's agreement to accept petitioner, or an administrative decision to parole petitioner into the country, permitting him to live outside of a governmental detention facility. 8 U.S.C. § 1182(d)(5); 8 C.F.R. §§ 212.12, 212.13. INS has again reviewed petitioner's file to determine if parole is warranted, and has decided against granting parole.

Petitioner now brings this application for writ of habeas corpus.[2] Because of the form nature of his pleadings, it is difficult to discern the precise ground which he claims justifies outright release, or entitlement to habeas review. Nevertheless, the court will attempt to parse through the relevant statutory and regulatory provisions as they apply to petitioner.

Generally, petitioner claims that INS has no authority to detain him. He asserts that INS may detain an excludable alien only for a reasonable time after it has rendered a final order of exclusion; thereafter, it must either parole the alien or release him outright. Each petitioner points to the existence of various constitutional and statutory provisions in support of his assertion that the INS is violating his liberty interests.

Petitioner first alleges that his continued detention violates his fifth amendment right to due process of law and his sixth amendment privileges. An alien seeking admission to the United States does not possess fifth amendment rights because the power to admit aliens into the country is a sovereign prerogative. *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Thus, an alien seeking admission is afforded only those rights that Congress decides to extend. *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). The government does not violate an excludable alien's process rights if it continues to detain him pending his deportation, even where the government offers no reason for the alien's continued detention. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953); *Fernandez–Roque v. Smith,* 734 F.2d 576, 582 (11th Cir.1984). Furthermore, the sixth amendment is not implicated because immigration proceedings and detention do not constitute criminal proceedings or punishment and the rights afforded to those accused of committing crimes are not invoked. *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984).

The same analysis applies to an excludable alien seeking parole into the country. Such an alien has no due process rights to parole. *Shaughnessy,* 345 U.S. at 207, 73 S.Ct. at 626; *Fernandez–Roque I,* 734 F.2d at 582; *Jean v. Nelson,* 727 F.2d 957, 972 (11th Cir.1984) (en banc).

Petitioner cites cases supporting his contention that excludable aliens possess constitutional rights. Those holdings are distinguishable from the present matter because those cases considered either an alien's constitutional interests in matters extraneous to immigration or the constitu-

---

petitioner never entered the country, he is subject to exclusion rather than deportation. *Garcia–Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985). Those who have entered the country, even illegally, possess greater constitutional and statutory rights in the immigration and deportation context. *See generally Landon v. Plasencia,* 459 U.S. 21, 25–27, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982); 8 U.S.C. § 1251; Tribe,

*American Constitutional Law,* § 5–16 at 358–59 (1988).

**2.** The INS has moved many of the petitioners out of the Western District of Louisiana. The move does not affect the court's jurisdiction. *Goodman v. Keohane,* 663 F.2d 1044, 1047 (11th Cir.1981).

tional rights of aliens who have entered the country and therefore possess a modicum of constitutional protection. *See e.g. Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (children of aliens who have entered the country illegally entitled to public education under fourteenth amendment); *United States v. Henry,* 604 F.2d 908 (5th Cir.1979) (alien must be given *Miranda* warnings in criminal proceedings). As the court has noted, such cases are not applicable to petitioner.

█ Petitioner next argues that his detention violates customary international law. Of course, international law is part of the law of the United States. *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). Customary international law is analogous to common law, and is comprised of internationally recognized principles of law. Assuming without deciding that petitioner's detention violates customary international law, he is nevertheless not entitled to release. International law is applicable only when domestic law does not speak to the outcome and is not controlling when there has been a conflicting legislative, executive, or judicial act. *Paquete Habana,* 175 U.S. at 700, 20 S.Ct. at 299; *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 939 (D.C.Cir.1988); *United States v. Merkt,* 794 F.2d 950, 954 (5th Cir.1986). Here, Congress has established a scheme for dealing with the Mariel Cubans, the executive branch has promulgated rules implementing this legislation, and the courts have held that an alien may not challenge his continued detention without a hearing. Thus, the Mariel Cubans may not challenge their detention on the basis of international law. *Garcia–Mir v. Meese,* 788 F.2d 1446, 1454–55 (11th Cir.1986).

Petitioner also asserts that the INS has no authority under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., to detain indefinitely an excludable alien. The act provides that, upon an alien's arrival at the border of the United States, an immigration official may temporarily detain the alien for further inquiry if he "may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land...." 8 U.S.C. § 1225(b). The case is then referred to a special inquiry officer for an evidentiary hearing. 8 U.S.C. §§ 1225(b), 1226(a). Such detained aliens are classified in two ways. First, if detained, and if either the examining immigration officer or the special inquiry officer finds the alien to be excludable under 8 U.S.C. § 1182(a)(27), (28), or (29) (generally, aliens whose presence would endanger the welfare, safety, or security of the United States), the alien "shall be temporarily excluded." 8 U.S.C. § 1225(c). The Attorney General is then notified.[3] If he is satisfied that the alien is excludable under the above-cited sections, and if the information upon which the Attorney General bases his finding is confidential, the alien may be summarily excluded. Otherwise, a detained alien is entitled to an exclusion hearing before a special inquiry officer in which the alien may introduce evidence and examine witnesses. From an adverse decision of the special inquiry officer, the alien may appeal to the Attorney General. 8 U.S.C. § 1226(b). As mentioned previously, the only means to challenge the Attorney General's adverse decision to exclude is by application for writ of habeas corpus in the district court.

Any alien that is excluded "shall be immediately deported,"[4] unless the Attorney General finds that in an individual case immediate physical transfer is not practicable or proper. 8 U.S.C. § 1227(a). As noted earlier, problems arise when there is

---

**3.** The Immigration and Naturalization Service operates under the direction of the Attorney General and is part of the Justice Department. 8 U.S.C. § 1551.

**4.** Although the word "deported" is used, it is clear that the statute means that the alien shall be physically removed, rather than that the government must then institute deportation proceedings against the alien. The use of the term "deportation" in the exclusion sections "reflects none of the technical gloss accompanying its use as a word of art" in the deportation sections. *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958); *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982).

literally no place to send the alien. Cuba has refused to admit petitioner. In 1984, Cuba agreed to accept approximately 2,400 detainees. Lamentably, Cuba suspended its execution of the agreement shortly after the program began. The Government asserts that it is handling the problem of indefinite detention of the Cubans in two ways. First, it is continuing to prevail upon the Government of Cuba to accept return of all the detainees. Second, it is actively reviewing each Cuban for parole under a program instituted after disturbances at the Federal Detention Centers in Atlanta, Georgia and Oakdale, Louisiana. *See* 8 C.F.R. §§ 212.12, 212.13.[5]

■ As petitioner correctly notes, the INA does not explicitly permit INS to detain indefinitely an excludable alien, although it does permit temporary detention as previously discussed. The prevailing jurisprudence concerning the Mariel Cubans' situation is that the government may not indefinitely detain an excludable alien in lieu of deportation unless it shows that the detention remains temporary. *Amanullah v. Nelson,* 811 F.2d 1, 9 (1st Cir.1987); *Fernandez–Roque I,* 734 F.2d at 582; *Palma v. Verdeyen,* 676 F.2d 100, 104–05 (4th Cir.1982); *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1389–90 (10th Cir. 1981); *Tartabull v. Thornburgh,* 755 F.Supp. 145, 147 (E.D.La.1990); *Gallego v. Immigration and Naturalization Service,* 663 F.Supp. 517, 527 (W.D.Wis.1987). This requirement stems from the statutory provision that the Attorney General may in his discretion determine in an individual case that immediate deportation is not practicable or proper. The test the courts have applied gauges whether this discretion was properly exercised in determining that immediate deportation is not practicable. *Palma,* 676 F.2d at 104.

■ The INS has shown that it periodically reviews for parole all detainees. It has further introduced evidence that discussions between the governments of the United States and of Cuba concerning the repatriation of the detainees are ongoing. Representatives of the two governments held talks during June 1990 concerning the execution of the 1984 agreement. The courts in three of the cases cited above (*Fernandez–Roque; Palma; Gallego*) held that the INS parole program was sufficient to demonstrate that the detention remained temporary in character. The Parole Review Plan was instigated in 1987, well after the Tenth Circuit's decision in *Rodriguez–Fernandez.* It provides for more frequent parole reviews and more formal procedures in obtaining parole than the policy in effect when the Tenth Circuit court decided that case. Thus, the decision is not controlling. In any event, that negotiations aimed at procuring petitioner's deportation to Cuba are occurring is sufficient to satisfy the statutory criteria for indefinite detention notwithstanding any deficiencies in the parole program. The court rejects this statutory challenge as well.

Although not briefed, petitioner asserts that he has an expectation of liberty arising from President Carter's invitation to the Cubans who amassed at the United States Embassy in Havana during 1980 to come to the United States. He further refers to his "unextinguished right to bodi-

---

5. Under this latter program, Mariel Cubans who have been detained for any reason and may not be returned to Cuba are reviewed for parole once a year. Mariel Cubans are considered for parole in accordance with the recommendations of review panels established by the Director of the Cuban Review Plan. The panels are directed to consider various criteria in making their recommendations. A favorable recommendation by such a panel is forwarded to the Associate Commissioner for Enforcement. This officer has the authority to grant parole either outright or with certain conditions. Those Cubans whom the INS has denied parole under these procedures may request parole from a special Department Panel, a member of which interviews the applicant. The panel makes a written decision as to the advisability of parole. However, an applicant is entitled to only one review by a Department Panel. Thus, if he applies for parole and is denied, obtains review before a Department Panel and is denied, and then is denied for parole again, he cannot obtain a second Department Panel review. Parolees are required to obtain sponsorship, however, which generally involves placement in a halfway house, or with a close relative. Paroles may also be revoked if the conditions attendant to such are violated.

ly freedom." As petitioner cites no authority supporting his right to habeas relief stemming from these two concerns, the court rejects them as a basis for such relief.

■ Finally, petitioner argues that he has expectations of liberty arising from INS' parole policy. The parole authority granted to the Attorney General under section 1182(d)(5) is completely discretionary in the Attorney General. The Attorney General possesses the authority to parole an excludable alien into the country. Such a parole does not change a parolee's status from excludable to admitted, however, and a paroled alien remains classified as having never entered the country. *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958); *Delgado–Carrera v. United States,* 773 F.2d 629, 632 (5th Cir.1985); *Fernandez–Roque v. Smith,* 734 F.2d at 579. Subject to the provision that such paroles may be denied only for facially legitimate and bona-fide reasons, the courts may not review the Attorney General's decision to deny a parole to an excludable alien. *Amanullah v. Nelson,* 811 F.2d 1, 10 (1st Cir.1987); *Perez–Perez v. Hanberry,* 781 F.2d 1477, 1482 (11th Cir.1986); *Pierre v. United States,* 547 F.2d 1281, 1289 (5th Cir.1977); *Tartabull,* 755 F.Supp. at 147.[6]

■ Here, petitioner was granted parole shortly after his initial arrival at the border. INS subsequently revoked that parole. Pursuant to regulations, petitioner's case was reviewed again by the parole panel. The panel stated that it could not recommend parole because it could not conclude that petitioner was a non-violent person, or that petitioner was unlikely to commit further crimes if paroled. Thus, the government clearly stated a facially legitimate and bona fide reason for denying parole. Past criminal convictions constitute a facially legitimate and bona fide reason to deny parole. *Perez–Perez,* 781 F.2d at 1477.

As mentioned previously, the fact that a parole program exists does not create substantive rights to parole because parole is almost entirely discretionary. Respondent submitted proof showing that most of the Mariel Cubans were paroled into the country shortly after their arrival in 1980. Once it became clear, however, that many of the parolees created for themselves alarming criminal records while in Cuba and that many were committing crimes in the United States while on parole, INS revoked a substantial number of the paroles.

After the 1987 riots, the Department of Justice instituted the Parole Review Plan, as described in the margin. The plan by its express terms constitutes the manner in which the Attorney General's significant parole discretion is exercised. It creates no more of a guaranty of liberty than the general parole provisions. The court further notes that release after parole is conditioned on acceptance by a halfway house or a close relative. Finally, the fact that the parole may be revoked should serve as evidence that parole in this context cannot create a guaranty of freedom. With the significant constraints on an excludable alien's activities while paroled into the country, it is difficult to discern exactly how parole status may create any sort of expectation of liberty. Petitioner does not cite authority that holds that it does so.

The habeas application presents a case within the court's jurisdiction. The application, however, fails to present meritorious grounds for relief. Accordingly, the court DENIES petitioner's application for a writ of habeas corpus.

---

6. Of course, the courts may review whether the Attorney General acted in accordance with his own regulations and the parole statute. *See*

*Jean v. Nelson,* 472 U.S. 846, 857, 105 S.Ct. 2992, 2998, 86 L.Ed.2d 664 (1985); *Moret v. Karn,* 746 F.2d 989, 991 (3d Cir.1984).