Joseph BERTRAND, et al.,
Petitioners-Appellees,

v.

Charles SAVA, et al.,
Respondents-Appellants.

Laissez-Moi VIGILE, et al.,
Petitioners-Appellees,

v.

Charles SAVA, et al.,
Respondents-Appellants.

No. 1237, Docket Nos. 82–2110, 82–2123.

United States Court of Appeals,
Second Circuit.

Argued April 30, 1982.

Decided June 25, 1982.

Harriet Rabb, New York City (Susan D. Susman, Immigration Law Clinic, Steven R. Shapiro, New York Civ. Liberties Union, Stanley Mailman and Arthur C. Helton, Mailman & Ruthizer, New York City, on the brief), for petitioners-appellees.

Harvey J. Wolkoff, New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Michael H. Dolinger, Asst. U. S. Atty., and Thomas H. Belote, Sp. Asst. U. S. Atty., New York City, on the brief), for respondents-appellants.

Before MANSFIELD and KEARSE, Circuit Judges, and CABRANES, District Judge.*

JOSÉ A. CABRANES, District Judge:

The questions presented arise from judicial review of discretionary decisions by a District Director of the Immigration and Naturalization Service ("INS") to deny parole to unadmitted aliens[1] who are detained pending the completion of proceedings to consider their applications for political asylum and their exclusion. The INS District Director for the New York area, Charles Sava, denied the parole requests of fifty-three unadmitted Haitian aliens. On petitions for the writ of habeas corpus, the United States District Court for the Southern District of New York (Robert L. Carter, Judge) held that the INS District Director had abused his discretion in denying the requests and ordered their release "under reasonable release conditions." 535 F.Supp. 1002 (S.D.N.Y.1982); 535 F.Supp. 1020 (S.D. N.Y.1982).

We reverse.

## INTRODUCTION

The original petitioners are eight unadmitted aliens detained since their arrival in Florida from Haiti in makeshift boats in the summer of 1981. Forty-five other similarly-situated Haitian aliens became parties to this action when the trial court certified a class of fifty-three persons. Upon their arrival in the United States, the petitioners were detained by the INS at Camp Krome in Miami, Florida. On July 18, 1981, the

---

* The Honorable José A. Cabranes of the United States District Court for the District of Connecticut, sitting by designation.

1. For convenience, we use the term "unadmitted" alien as synonymous with "non-resident," "excluded" or "excludable" alien or "an alien denied entry." Each of these terms has been used, in different contexts, to describe the alien who has reached our border but has not been formally permitted to enter the country. Even though physically present in the country, he is "treated as if stopped at the border," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 630, 97 L.Ed. 956 (1953); if temporarily admitted on parole, the "unadmitted" alien "gains no foothold in this country and is regarded as having been stopped at the threshold." 1A C. Gordon and H. Rosenfield, Immigration Law and Procedure § 3.17c at 3–173 (Rev. ed. 1980).

The word "deportation" has occasionally been used by Congress and others to refer to the process for the removal of unadmitted aliens, "but its use [in this context] reflects none of the technical gloss accompanying its use as a word of art in [the parts of the immigration laws dealing with the process of removing resident aliens,]" *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). *See also Mayet Palma v. Verdeyen*, 676 F.2d 100 at 104 n.4 (4th Cir. 1982) (same).

One commentator in 1962 attempted to sort out the terminological confusion in INS proceedings as follows:

Technically, *exclusion* refers to the refusal to admit a non-resident alien; *expulsion* refers to the required departure of a resident alien; and *deportation* refers to any process by which an alien physically within this country or detained at a border is removed. Since aliens can be physically present without having made an *entry in contemplation of law*, deportation can be the removal of either an excluded [or unadmitted alien] or [an] expelled [resident] alien.

[In a non-technical sense,] "exclusion" is the process of *excluding* and *deporting* a non-resident alien; "deportation" is the process of *expelling* and *deporting* a resident alien. Comment, *Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts ("Deportation and Exclusion")*, 71 Yale L.J. 760, 761 n.8 (1962).

INS transferred them to the Service Processing Center ("SPC") in Brooklyn, New York, where they have been detained until now. In August 1981 the INS began proceedings to consider both the exclusion of the fifty-three from the United States (pursuant to 8 U.S.C. §§ 1225, 1226 and 8 C.F.R. § 236.2) and their applications for political asylum (pursuant to 8 U.S.C. §§ 1158, 1226 and 8 C.F.R. §§ 108, 236.3).[2]

Procedures for determining the admissibility of unadmitted aliens are found in the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., and regulations promulgated thereunder. The statute provides that any alien "who [upon arrival in the United States] may not appear to [an INS] examining officer . . . to be clearly and beyond a doubt entitled to land" is to be detained for examination by a special inquiry officer or immigration judge of the INS. 8 U.S.C. §§ 1225(b) and 1226(a); see 8 C.F.R. § 236.1. The immigration judge decides whether to admit formally or to exclude and deport the arriving alien. Id. An excluded alien is immediately returned to the country from which he came "unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a). A decision by an immigration judge to exclude an arriving alien may be appealed to the Board of Immigration Appeals ("BIA"), 8 C.F.R. § 236.7, the decision of which is appealable to the United States Court of Appeals for the relevant circuit. 8 U.S.C. § 1105a. The Attorney General may, in his discretion, "for emergent reasons or for reasons deemed strictly in the public interest," parole an alien into the United States pending the outcome of exclusion hearings. However, a paroled alien is not regarded as having been "admitted" into the United States. 8 U.S.C. § 1182(d)(5)(A).[3] The Attorney General has delegated to INS District Directors his discretionary authority to act on requests for parole by unadmitted aliens detained in their respective districts. 8 C.F.R. § 212.5.[4]

## PRIOR PROCEEDINGS

At the start of the INS exclusion hearings, each petitioner requested that counsel

2. Such prompt scheduling of exclusion hearings is not unusual. Proceedings to "exclude" an alien are often completed shortly after the alien's arrival; even after judicial review of INS decisions to exclude, the whole process by which an unadmitted alien may be turned back at our border may take no longer than several days. See, e.g., Petition of Cahill, 447 F.2d 1343 (2d Cir. 1971) (unadmitted alien scheduled for exclusion hearing one day after arrival at New York airport; judicial review of INS refusal to parole the alien pending INS exclusion hearing completed by District Court and Court of Appeals only two days after unadmitted alien's arrival and detention).

Indeed, we were informed at oral argument that in the case of detained unadmitted aliens from contiguous countries it is the practice of the INS simply to "turn them around and put them out." See Shaughnessy v. United States ex rel. Mezei, supra, 345 U.S. at 215, 73 S.Ct. at 630. ("[a]liens seeking entry from contiguous lands obviously can be turned back at the border without more"); Ahrens v. Rojas, 292 F.2d 406, 410 (5th Cir. 1961) (same); Doe v. Plyler, 458 F.Supp. 569, 591 (E.D.Tex.1978), aff'd, 628 F.2d 448 (5th Cir. 1980), aff'd, —— U.S. ——, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (federal government protects "domestic labor market" by turning aliens "back at the border . . . rather than [letting them] enter"); see also United States ex rel. Polymeris v. Trudell, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291 (1932) (alien held at the Canadian border).

3. See note 1 supra. 8 U.S.C. § 1182(d)(5)(A) provides, in pertinent part, as follows:

The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

4. 8 C.F.R. § 212.5(a) provides, in pertinent part, as follows:

The district director in charge of a port of entry may, prior to examination by an immigration officer, or subsequent to such examination and pending a final determination of admissibility in accordance with sections 235 and 236 of the Act and this chapter, or after a finding of inadmissibility has been made, pa-

be appointed to assist him in the pursuit of his claims. To comply with these requests the hearings were temporarily adjourned. In September and October 1981, after the appointment of counsel, each petitioner filed an application for political asylum. At about the same time, each of the eight original petitioners filed requests to be released on parole with Charles Sava, the District Director of the INS for the New York area. In the fall of 1981 Sava denied each of the eight applications for parole, in the asserted belief that the petitioners would abscond if temporarily permitted to enter the country.[5]

On November 25, 1981, the original eight petitioners commenced these habeas corpus

proceedings. 28 U.S.C. § 2241. They challenged Sava's denial of their parole requests and their continued detention on the grounds, *inter alia*, that (1) Sava had either failed to exercise the discretion delegated to him by the Attorney General or, in the alternative, had abused that discretion by invidiously discriminating against the petitioners because of their race or national origin; and (2) Sava had violated the United Nations Convention and Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, 6259, T.I.A.S. No. 6577 (jointly, the "Protocol").[6] In bringing these habeas corpus actions the petitioners did not claim the right to remain in the United States. Their claims to political asylum and their resistance to exclusion and deportation are the

---

role into the United States temporarily in accordance with section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5)] any alien applicant for admission at such port of entry under such terms and conditions, including the exaction of a bond[,] ... as such officer shall deem appropriate.

8 C.F.R. § 212.5 was promulgated pursuant to 8 U.S.C. § 1182(d)(5), *supra* note 3.

5. It is noteworthy that the petitioners have been detained, absent parole, because they have accepted opportunities afforded them by law to pursue applications for political asylum and otherwise to resist the Government's efforts to deny them admission to the United States and the relevant proceedings have not yet been completed. At the conclusion of their exclusion/asylum proceedings they will either be admitted to the country or be deported; they would be released at any time if they chose to return to Haiti or go to another country that would receive them.

6. In the third count, the petitioners also assert claims under the Fifth Amendment to the Constitution. Although the District Court's opinions of March 5, 1982 and April 5, 1982 appear to be substantially based upon constitutional considerations, petitioners on appeal assert that "[t]his case was not decided on constitutional grounds[,]" Brief for the Petitioners-Appellees at 28 n.23 (filed April 27, 1982); they seem to rely only on allegations of abuse of discretion. In any event, to the extent that the Fifth Amendment arguably forbids the INS from discriminating against the petitioners on the basis of race or national origin, such discrimination would constitute an abuse of discretion. *See* note 12, *infra*, and accompanying text.

The petitioners make much of the fact that they have been detained, in allegedly "substandard facilities," since their arrival in July 1981. It may be noted that the petitioners had been detained barely four months at the time these lawsuits were begun. The District Court, acting with commendable dispatch, issued its order and judgment (after holding hearings and receiving much documentary evidence) a little more than four months later. During the time the courts have had these cases under advisement, exclusion/asylum hearings have proceeded apace. We have been informed since oral argument that the hearings in all fifty-three exclusion proceedings have been completed; that an initial decision has been made by an immigration judge (in each case, apparently, the judge denied the application for political asylum and ordered the exclusion of the alien); and that these cases are now before the BIA (from whose decision an appeal may be taken to this Court). If a petitioner prevails in his exclusion proceeding, he presumably will be admitted into the country. If he does not, he presumably will return to Haiti or go to another country that will receive him. In either case, his detention will end when he has exhausted his remedies under our laws; his detention is in no sense indefinite or permanent. *See* note 2, *supra.*

Apart from unsubstantiated conclusory statements made in passing by the District Court that the petitioners have been confined in "substandard" or "inadequate" facilities and in "a harsh environment," 535 F.Supp. at 1007, 1030, 1031, not a single finding of fact was entered by the District Court on the conditions of their confinement, and questions regarding those conditions are not before us on this appeal.

subject of separate proceedings and do not concern us at this time.

The original eight petitioners sought and obtained a prompt evidentiary hearing on their claims in these actions. At the hearing held on January 22 and January 26, 1982, the petitioners called four witnesses and the Government called three. The principal Government witness was Sava, who attempted to explain generally how decisions involving parole applications are made, and, in particular, how he had made the decisions to deny the petitioners' requests.

In its first ruling, issued on March 5, 1982, the trial court held that it could review for abuse the INS District Director's discretionary decisions on requests for parole. In addressing the merits of the petitioners' claims, the court found that Sava knew little about "the individual characteristics" of the petitioners but was well versed in the detail of the files of certain comparable non-Haitian applicants and that all the petitioners had received identical form letters informing them of the fact that their requests had been denied. On the basis of these findings it concluded that Sava had improperly failed to exercise any discretion in reviewing petitioners' requests.

Assuming *arguendo* that some discretion had been exercised by Sava, the District Court turned to the alternative question of whether Sava had abused that discretion. It considered whether Sava had made parole decisions concerning non-Haitians in similar circumstances and, if so, whether those decisions were consistent with Sava's decisions on petitioners' applications. The court found that there were twelve unadmitted non-Haitian aliens who had applied to Sava for parole and whose circumstances were "indistinguishable" in relevant respects from those of the eight petitioners.[7] The only differences between the two assertedly "comparable" groups of parole applicants, the court held, were (1) that the petitioners were Haitians and black while the members of the group of twelve were neither Haitians nor black and (2) that Sava had denied all of the petitioners' requests for parole while he had granted all twelve of the requests from the group of twelve non-Haitians.

Based on this comparison, the District Court concluded that Sava had abused his discretion. In the court's view, the only reason that petitioners' requests for parole were denied was "because [the petitioners] were black and/or because they were Haitians." Accordingly, it ordered the INS either to release the eight petitioners on parole within 10 days or, in the alternative, to "show cause in writing, supported by affidavit, reasons for believing that any or all of [the petitioners] pose a risk of absconding."

The INS declined to release any of the petitioners and sought to comply with the court's alternative directive. On March 15, 1982, Sava filed with the court an affidavit which attempted to demonstrate that the eight petitioners were different in relevant respects from the group of twelve non-Haitians identified by the court for comparison purposes; that the petitioners posed "extremely significant" risks of absconding; and that the denial of the petitioners' parole requests was justified.

---

7. *See* 535 F.Supp. at 1010–1013. The District Court determined that there were twelve members of the "comparable" group in the following manner. The court first found that there were 183 non-Haitian parole applicants about whom the petitioners had presented statistical information. From this group, the court then subtracted the 84 non-Haitian aliens whose parole applications had been granted prior to Sava's appointment as INS District Director in New York on July 6, 1981, leaving 99 non-Haitians to be considered. The court then reduced that number to 90 by removing from consideration nine non-Haitians who had withdrawn, or never filed, political asylum applications. Of the remaining 90 non-Haitian aliens, the court found that 78 presented compelling humanitarian concerns that warranted their parole and set them apart from the petitioners. This left twelve non-Haitian aliens who, in the court's view, were "indistinguishable" in all relevant respects from the eight original petitioners. Significantly, the court expressly concurred with Sava's conclusion that the petitioners did not "possess 'humanitarian factors' sufficient to warrant parole." 535 F.Supp. at 1008 & n.5.

On March 10, 1982, the petitioners filed a motion for leave to amend their petitions to add class allegations and include forty-five other unadmitted Haitian aliens detained at the SPC as part of a defined class of fifty-three persons, a motion to certify this class and a motion for summary judgment in favor of the class.

The District Court issued a second ruling on April 5, 1982. In that ruling, the court refused to accept the arguments or consider the information presented in Sava's March 15, 1982 affidavit. It held that the Sava affidavit contained a series of "[p]ost-hoc rationalizations" of Sava's original decisions and constituted an improper attempt to "reopen the record" that had been closed at the end of the evidentiary hearing in January. The court also granted the three motions filed by the petitioners on March 10, 1982 and ordered the Government to release all fifty-three members of the newly-certified class. The Government appealed, 28 U.S.C. § 1291, and another panel of this Court stayed the District Court's order pending oral argument and a decision by this panel.

The following questions are presented:

(1) May a federal court review discretionary actions by an INS District Director denying requests by detained unadmitted aliens for parole into the United States pending hearings on exclusion and applications for political asylum? If so, what is the scope of the court's authority to review such discretionary actions?

(2) Did the trial court err in holding that the respondent INS District Director failed to exercise his discretion to parole unadmitted aliens or, alternatively, that he had abused that discretion by discriminating against the fifty-three aliens because of their race or national origin?

(3) Does the Protocol afford the petitioners any rights beyond those available to them under domestic law?

(4) Did the District Court err in certifying the class of fifty-three unadmitted aliens and granting summary judgment in favor of that class?

We hold that the federal courts may exercise habeas corpus jurisdiction to review allegations that an INS District Director has abused his discretion in making parole decisions; that in the particular circumstances of this case, the INS District Director did exercise his discretion; that the District Court's conclusion that the INS District Director abused his discretion was based upon an overly-broad interpretation of the scope of judicial review in cases such as these and the substitution of the court's judgment for that of the INS District Director; that the Protocol does not afford petitioners any rights beyond those provided under domestic law; and that certification of the class of fifty-three persons will be left undisturbed, subject to later review, if necessary. Accordingly, we reverse the judgment in favor of the class and remand the cause for further proceedings.

## DISCUSSION

### I.

### *Judicial Review of Discretionary Power to Parole Unadmitted Aliens*

The threshold issue is the extent to which the courts may review a decision by an INS District Director to deny parole to detained unadmitted aliens—that is, non-resident aliens properly detained on arrival but not yet formally "excluded" from the United States.

In the course of this litigation, the Government has presented three arguments on the courts' power to consider the issues raised by the petitioners. First, the Government argued below that "[j]urisdiction for courts to review the denial of a stay of a deportable alien has been specifically granted by Congress ... [but] [n]o such review jurisdiction exists in the case of unadmitted excludable aliens seeking parole into the United States." Joint Appendix at 1050. Second, assuming only for the argument on appeal that parole decisions in the cases of unadmitted aliens are subject to some judicial review, the Government now asserts that "the maximum breadth of [a court's] inquiry must be whether the dis-

trict director exercised his discretion." Brief for the Respondents-Appellants ("Respondents' Brief") at 34 (filed April 23, 1982). Relying on the leading case on this subject in this Circuit, *Petition of Cahill*, 447 F.2d 1343 (2d Cir. 1971) (per curiam), the Government in effect argues that if it can be shown that the INS District Director did exercise his discretion, his decision must be affirmed without further inquiry. In a third optional argument, the Government asserts that judicial review "arguably" extends to the broader (but nonetheless limited) inquiry "whether [the INS District Director's] parole release criteria were 'wholly irrational' or 'facially legitimate.'" Respondents' Brief at 34–35.

In contrast, the petitioners argue that "[t]his is a discrimination case." Brief for the Petitioners-Appellees ("Petitioners' Brief") at 1 (filed April 27, 1982). They contend not only that the courts have the power to review for abuse the discretionary decisions on parole by INS District Directors, but also that the nature of this review is substantially identical to that which courts generally conduct in cases alleging invidious discrimination by federal officials.

### A.

■ We conclude that the federal courts may review INS decisions to deny parole to unadmitted aliens in the circumstances presented by this case—namely, a habeas corpus action brought by unadmitted aliens who assert that their continued detention by the INS is the result of abuse of discretion by an INS official who does not claim to act pursuant to a national policy adopted by the political branches of the federal government.[8] In arguing that the court has no power to review the discretionary decisions on parole of the INS District Director, the Government relied on a line of cases that sustain decisions by the INS in exclusion proceedings. *See, e.g., Hsieh v. Kiley*, 569 F.2d 1179 (2d Cir. 1978), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978). Even in this long line of cases, however, there is no suggestion that the courts are wholly without power to consider a petition for a writ of habeas corpus challenging the detention of an unadmitted alien or that in habeas corpus cases the courts may not consider allegations of abuse of discretion.

Discretion vested by statute in agents of the federal government is rarely, if ever, entirely free of judicial review for abuse. The principle that discretionary power is not absolute power is fundamental to our constitutional form of government. The discretionary power to parole unadmitted aliens granted by statute to the Attorney General, and delegated by him to INS District Directors, is broad, but it is not without limits. *See Mayet Palma v. Verdeyen*, 676 F.2d 100, 105 (4th Cir. 1982) (Attorney General's denial of parole to an unadmitted alien reviewed for abuse of discretion).[9] In

---

**8.** The Government has vigorously and consistently denied that Sava's decisions were based on any national policy with respect to unadmitted Haitian aliens, and the District Court concluded that the existence of any such policy had not been proved. 535 F.Supp. at 1017, n.27. Accordingly, neither the District Court nor this Court has considered whether or how our conclusions regarding judicial review of administrative action denying parole might be affected by the existence of a national policy to deny parole to unadmitted aliens of a particular race or from a particular country.

**9.** One commentator has described failure to consider a case as a species of "abuse of discretion": "The courts will not usually review on habeas corpus the Attorney General's refusal to exercise a discretionary power to admit aliens within [unadmitted] classes. Failure to consider a case, however, is an abuse of discretion." *Developments in the Law: Immigration and Nationality ("Immigration and Nationality")*, 66 Harv.L.Rev. 643, 672 (1953) (footnotes omitted). The same commentator notes that "[h]abeas corpus has been available from the first cases to test the legality of the alien's detention.... It seems clear that there is implicit in this history of judicial intervention a theory of due process, of judicial supervision of administrative action arising out of our pervading constitutional concept of a rule of law." *Id.* at 675. It has also been observed that "[e]ven if the non-resident [or unadmitted] alien were entitled to no constitutional protection, it would not follow that the exclusion power is unlimited, for to allow Congress to act totally at will—let alone to delegate such authority to

granting the Attorney General this discretionary power, Congress did not modify or qualify the availability of a habeas corpus action to unadmitted aliens detained pending completion of exclusion proceedings. Accordingly, the exercise of administrative discretion on parole requests by unadmitted aliens may be judicially reviewed.[10]

### B.

Although the discretionary decisions of INS District Directors to parole unadmitted aliens may be judicially reviewed, the scope of that review is necessarily narrow.

The Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens[,]" *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977) (citations omitted), and that "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Id.* The teaching of *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954) has frequently been noted. After observing that "much could be said for the view" that due process places some limitations on the power of Congress in this

area, "were we writing on a clean slate," Justice Frankfurter added:

> But the slate is not clean. As to the extent of the power of Congress under review, there is not merely "a page of history," ... but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government....

*Id.* at 530–531, 74 S.Ct. at 742–743 (citations omitted).[11]

The limits to this legislative power are few, "for an alien has no constitutional right to enter or remain in this country... [and] he may be denied entrance on grounds that would be constitutionally suspect or impermissible in the context of domestic policy, namely, race, physical condition, political beliefs, sexual proclivities, age, and national origin." *Fiallo v. Levi*, 406 F.Supp. 162, 165 (E.D.N.Y.1975) (three-judge court) (Moore, J., sitting by designation) (foot-

---

an administrative agency—is inconsistent with the concept of responsible government. The logic of the [resident alien] cases rests not simply on the rights of residents, but on the requirement that agents of the government may not act arbitrarily." *Deportation and Exclusion, supra*, at 785–786 (footnotes omitted).

10. *Petition of Cahill*, 447 F.2d 1343 (2d Cir. 1971) does not support the argument that courts are wholly without power to review discretionary actions of INS District Directors on parole requests. In that case we expressly reached the merits of the petitioner's claim of abuse of discretion, finding that "[p]etitioner's allegation that the denial of bail or parole ... was arbitrary and capricious ... is without merit." *Id.* at 1344. In any event, that case was markedly different from the one now before us. In *Petition of Cahill* the individual petitioner was detained at New York's Kennedy Airport on September 1, 1971 upon his arrival from Dublin. Judicial review of the decision to deny him parole, pending an exclusion hearing to be held less than a week later, was completed by the Court of Appeals (after a

decision by the District Court) on September 3, 1971. There were no allegations in *Petition of Cahill* of unlawful discrimination on the basis of race or national origin by the Attorney General's delegates, and there was no suggestion in that case that the Government had deviated from its normal practices regarding parole requests because of such discrimination.

11. The broad power of the political branches of our national government to regulate the admission of aliens (and to determine rights to be accorded to unadmitted aliens) is directly traceable to the nation's sovereignty, Congress' power over foreign commerce and the President's power to control foreign affairs. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). *See generally*, 8 M. Whiteman, Digest of International Law 581 *et seq.* (1967); 3 G. Hackworth, Digest of International Law 725 *et seq.* (1942); 4 J. B. Moore, Digest of International Law 151 *et seq.* (1906); *Immigration and Nationality* at 647.

notes omitted), *aff'd sub nom. Fiallo v. Bell, supra; see also Pierre v. United States,* 547 F.2d 1281, 1290 (5th Cir. 1977) (en banc), *vacated and remanded to consider mootness,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977).

It is not disputed that the "plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established[,]" *Kleindienst v. Mandel,* 408 U.S. 753, 769–770, 92 S.Ct. 2576, 2585–2586, 33 L.Ed.2d 683 (1972); the cases supporting the principle "have been legion." *Id.,* 408 U.S. at 765–766 & n.6, 92 S.Ct. at 2582–2583 & n.6. It is in the exercise of this plenary authority over immigration matters that Congress granted to the Attorney General of the United States broad discretionary power to parole unadmitted aliens pending a final determination on their applications for admission to the United States. 8 U.S.C. § 1182(d)(5).

The unusually broad Congressional power over the admission of aliens into the United States is reflected in the narrow construction by the courts of their own power to review the discretionary decisions of the Attorney General made pursuant to authority delegated to him by Congress. The historic deference of the courts to the political branches of our national government in immigration matters is at the heart of the Supreme Court's statement of the scope of review of the Attorney General's exercise of discretion to deny temporary admission to an unadmitted alien in *Kleindienst v. Mandel, supra.* In that case, Congress exercised its plenary powers to deny admission to defined classes of persons and granted to the Attorney General discretion to waive inadmissibility and approve tempo-

rary admission. As in the case before us, the Attorney General exercised this discretionary power negatively. The Court concluded that in such a case "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against ... First Amendment interests ...." *Id.* at 770, 92 S.Ct. at 2585. This was true, however, only as long as the Attorney General exercised that discretionary power "on the basis of a facially legitimate and bona fide reason[.]" *Id.*

■ By the same token, as long as the Attorney General exercises his broad discretion under 8 U.S.C. § 1182(d)(5) to determine whether unadmitted aliens may be paroled pending final determination of their applications for admission to the United States, his decision may not be challenged on the grounds that the discretion was not exercised fairly in the view of a reviewing court or that it gave too much weight to certain factors relevant to the risk of abscondence and too little to others. Indeed, section 1182(d)(5) permits the Attorney General to deny parole to all or to certain groups of unadmitted aliens on the ground that he finds no emergent or public interest reasons justifying their release on parole. The discretion may not be exercised to discriminate invidiously against a particular race or group or to depart without rational explanation from established policies. *See Wong Wing Hang v. Immigration and Naturalization Service,* 360 F.2d 715, 719 (2d Cir. 1966). Such exercise of the power would not be "legitimate and bona fide" within the meaning of *Kleindienst v. Mandel.*[12] But the Attorney General's exercise of his broad discretionary power must be viewed at the outset as presumptively legit-

---

12. Invidious discrimination against a particular race or group by a public official is a type of irrational conduct generally not countenanced by our law; such discrimination ordinarily is inconsistent with a "facially legitimate and bona fide reason" for government action. However, as the District Court recognized, and no one disputes, "Congress may employ race or national origin as criteria in determining which aliens to exclude from the country[.]" 535 F.Supp. at 1016. The wide latitude historically afforded to the political branches of our nation-

al government in immigration matters permits them to adopt even wholly irrational policies in this area. Nevertheless, as the District Court noted, the constitutional authority of the political branches of the federal government to adopt immigration policies based on criteria that are not acceptable elsewhere in our public life would not permit an immigration official, in the absence of such policies, to "apply neutral regulations to discriminate on [the basis of race and national origin]." *Id.; see* notes 6 and 8, *supra,* and accompanying text.

imate and bona fide in the absence of strong proof to the contrary. The burden of proving that discretion was not exercised or was exercised irrationally or in bad faith is a heavy one and rests at all times on the unadmitted alien challenging denial of parole. *See Pierre v. United States, supra,* 547 F.2d at 1289.

## II.

### *The Decision and Judgment of the District Court*

A review of the District Court's rulings and the record of this case reveals that the INS District Director, in denying petitioners' applications for parole, did exercise the discretion delegated to him by the Attorney General. It also reveals that the trial court improperly concluded that the INS District Director abused his discretion.

### A.

In its ruling of March 5, 1982, the District Court first concluded that the discretion vested in the Attorney General by statute and delegated to Sava had not been exercised because Sava had failed to make individual decisions on the petitioners' parole requests. This conclusion was grounded on a finding that Sava's knowledge of the matter was based on "casual, inaccurate generalizations [that] rebut [Sava's] claim to have conducted individualized review[s]" and on a finding that "[e]ach denial, five of which were issued on the same day, contained the same language concerning the insufficiency of the information presented in the parole requests." To the trial court, "[b]oth the wording and the timing of these responses indicate that denial [of the parole requests] was a foregone conclusion, not a decision reached through independent review and

analysis of each file." 535 F.Supp. at 1014 & n.21.

The testimony upon which the court relied consisted of a brief exchange between the court and Sava in which the latter stated—in response to the court's request that Sava state "[j]ust generally, what kind of things [he knew] about [the petitioners]" —that the petitioners were "for the most part illiterate" and "[m]ost of them were farmers, working the land in Haiti." *Id.* The court, upon a review of the affidavits submitted by the petitioners and exhibits produced by the Government, concluded that the "generalizations" offered by Sava in response to the court's own request for general information were "casual" and "inaccurate" and inconsistent with an individualized review of the eight requests for parole. *Id.*[13]

Even if we assume for the argument that Sava's decision to deny parole was based on generalizations that were "casual" or "inaccurate," it does not follow that Sava thus failed entirely to exercise the discretion vested in him by law. Moreover, the finding that all of the notices sent to the petitioners informing them that their parole requests had been denied were form letters containing virtually identical language does not necessarily support the court's conclusion that no discretion had been exercised. While this finding may prove that the decision made in each case was the same—that is, that the parole requests were all denied—it is not at all probative on the question of whether there had been an individualized consideration of the actual parole requests.

The probative evidence in the record on which the trial court relied, therefore, is not sufficient to support its conclusion that

---

**13.** The following colloquy between Sava and the court appears to be the basis for the court's finding regarding Sava's "generalizations":

> The Court: Just generally, what kinds of things do you know about [petitioners]? Do you know about their education, things like that about them?
> Sava: Well to the extent it is documented, I know that for the most part they are illiterate—

> The Court: How do you know that?
> Sava: I think most of them in their affidavits make that ... admission.
> The Court: Do you know about their employment skills?
> Sava: Most of them were farmers, working land in Haiti.

535 F.Supp. at 1014, n.21.

Sava failed to exercise any discretion in rejecting the petitioners' parole requests. The record includes uncontroverted evidence that Sava did indeed affirmatively act to deny each petitioner's parole. Moreover, the record includes much evidence on the criteria used by Sava in making parole decisions and his conclusion that none of these eight petitioners met those criteria. The record here thus permits no conclusion other than that Sava did exercise his discretion, although perhaps partly on the basis of "generalizations."

### B.

■ The District Court did not rest its judgment exclusively on its finding that Sava had failed to exercise any of the discretion delegated to him by the Attorney General. Assuming *arguendo* that Sava had exercised some discretion, the court reviewed Sava's decisions under principles and evidentiary standards borrowed from domestic discrimination cases arising under the Fifth and Fourteenth Amendments to the Constitution. It concluded that Sava had unlawfully discriminated against the petitioners on the basis of race or national origin, thereby abusing his discretion. In reaching this conclusion, however, the court improperly substituted its judgment for that of the INS District Director on the criteria or factors to be used for deciding whether an alien poses a risk of absconding if paroled; it then undertook a broad-ranging comparative analysis of the eight petitioners and other unadmitted aliens upon whose parole applications Sava had passed. Had the court not substituted its judgment for that of Sava on the relevant parole criteria, its comparative analysis might have shown that the petitioners were not the victims of any invidious discrimination. Accordingly, we reverse the judgment of the District Court and remand the cause for further proceedings.

At the January 1982 evidentiary hearing, the Government set forth the criteria used to evaluate the risk of absconding of applicants for parole. The first criterion the Government claimed to employ in making decisions on parole applications is an alien's "documentation." An alien is said to be minimally documented, in the Government's view, "to the extent that [he has a] passport[,]" because, to obtain a passport the alien would "have been through a prior screening process[.]" The quality of an alien's documentation is substantially enhanced, according to the Government, if he has a visa issued by an American consulate abroad because an American consular screening process is a necessary condition for the issuance of a visa.

The second criterion the Government claimed to consider in making decisions on the risk of absconding is the likelihood of success of the alien's political asylum application—in Sava's words, "[H]ow much chance does [an alien's] application [for asylum] have of flying?"

The third criterion upon which the Government assertedly relied in deciding whether an applicant for parole posed a risk of absconding is whether the alien has a family member residing in this country who can confer an "immigration benefit" on him, such as a preferred entrance status. *See* 8 U.S.C. § 1154(a) and 8 C.F.R. §§ 204.1 *et seq.*

Finally, the Government claimed that it considered also several other factors in passing on parole requests by an unadmitted alien. These include the alien's prior immigration history (which might show whether he has complied with our laws when previously given the opportunity to do so); the alien's ability to sustain himself financially while on parole; sponsorship of the alien, if any, by a family member or an organization; and the ability of an alien to have bond posted on his behalf.

Although it had no burden on the matter, the Government presented evidence (most of which was undisputed) on how those criteria applied to the petitioners and other unadmitted aliens. It also offered evidence regarding its experience in paroling unadmitted Haitian aliens who had in recent years arrived under circumstances compara-

ble to those of the petitioners.[14]   Much of this evidence tended to indicate that the petitioners were quite different, in relevant respects, from the other, non-Haitian aliens over whose parole applications Sava had passed.[15]

14.   The petitioners argue that the Government's "reliance on generalized Haitian statistics only reinforces the impression that petitioners were treated on the basis of their nationality rather than their individual characteristics[,]" Petitioners' Brief at 22, and thereby suggest that the use of such data in immigration matters is either unusual or probative of invidious discrimination.   We disagree.   It is entirely reasonable that statistics on persons arriving in the United States be maintained, at least in part, on the basis of national origin.   Far from necessarily suggesting impropriety or unlawfulness, the compilation and use of information on groups which have been moved *en masse* to our shores—data on persons of common background and experience—is an integral part of any reasonable system for the control of our borders.   It is precisely in those cases most likely to evoke humanitarian concern for the fate of large numbers of similarly situated escapees from intolerable circumstances abroad—for example, the mass movements of people from Southeast Asia, Haiti and Cuba—that group statistics may be most helpful in determining claims to admission to the United States and related questions.   For example, the Select Commission on Immigration and Refugee Policy (Rev. Theodore M. Hesburgh, C.S.C., Chairman), which was appointed by President Carter and reported in March 1981 to President Reagan and to Congress, recommended that "the processing of asylum claims could be expedited and improved by developing group profiles based on evidence about how members of particular religious and ethnic groups or those with particular political and social affiliations are treated in different countries." *U.S. Immigration Policy and the National Interest* at 169, 171 (Mar. 1, 1981) (The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy to the Congress and the President of the United States).

15.   *See* note 7, *supra* and accompanying text. The Government's evidence demonstrated that none of the petitioners possessed any official travel documents and that none of the petitioners presented, in Sava's opinion, political asylum applications that were likely to "fly."   In addition, it showed that none of the petitioners had ever been in the United States before, so that the INS did not have any prior experience with them to permit Sava to conclude that they were disposed to comply with American immigration laws.   None of the petitioners offered to post bond and most had offers of sponsorship from large organizations, which the INS regarded as disfavored sponsors.   There appears to be no evidence in the record indicating that any of the petitioners had any means of supporting themselves in the event they were paroled.   In addition, none of the petitioners had any relatives in the United States who could confer on them "immigration benefits" in the near future.

The Government also presented evidence concerning the ninety non-Haitian aliens whose parole applications had been decided by Sava. First, the Government showed (and the trial court itself found) that seventy-eight of the ninety non-Haitian aliens paroled by Sava had compelling humanitarian reasons to justify their release.   There is no dispute among the parties that the release of these seventy-eight persons was fully justified.   With regard to the remaining twelve non-Haitians, the Government presented evidence that they did not pose great risks of absconding.   Eleven of the twelve were shown to have some form of official travel documentation; of these eleven, ten had been through a consular screening process, including four who had been screened by an American consulate.   Two of the twelve had entered the United States on prior occasions and, during those visits, had complied with our immigration laws.   Three of the twelve had relatives living in the United States who are (or, in the near future, would be) in a position to confer an "immigration benefit" on the alien seeking parole.   All twelve of these aliens, in Sava's view, presented "serious" asylum applications.   Finally, two of the twelve posted bond to secure parole, thus giving them a monetary interest in not absconding.

Much of the information concerning the twelve non-Haitians with whom the court chose to compare the petitioners was presented in an affidavit filed by Sava on March 15, 1982. Indeed, the only direct evidence concerning these twelve persons before the court at the time of its March 5, 1982 ruling was contained in the statistical summary sheets that had been prepared by the Government and filed by the petitioners.   Joint Appendix at 1497–1679.   We do not rely on the March 15, 1982 affidavit to support our conclusion that the District Court committed legal error in substituting its judgment for that of the INS District Director.   The affidavit does, however, suggest that this substitution may have led the court to err in concluding that the petitioners were indistinguishable from the twelve non-Haitian members of the comparison group and that Sava had engaged in invidious discrimination.   In any event, the parties in any subsequent evidentiary hearing before the District Court should be permitted to present evidence on the matters treated in the affidavit of March 15, 1982, as well as on other matters that have transpired since the earlier hearings which may have a bearing on a determination of the petitioners' allegations under the applicable principles of law.

Notwithstanding this evidence, the District Court found that the eight petitioners did not present any greater risk of absconding than did the twelve non-Haitians who were found to have no compelling humanitarian reasons justifying their parole. 535 F.Supp. at 1013; see notes 7 and 15, supra. The court reached this conclusion by substituting its judgment for that of Sava in deciding what criteria were relevant to determine whether a parole applicant presented a significant risk of absconding. While noting the factors articulated by the Government at the January 1982 hearing, the court discounted all of the differences between the two groups of applicants and concluded that in all relevant respects they were "indistinguishable." 535 F.Supp. at 1013.

The court recognized that "[a]n alien's documentation is important [in estimating] the absconding threat insofar as documented aliens have been through a screening process at a United States consular office abroad and have their identities and histories examined and verified," thereby crediting the Government's evidence concerning the importance of documentation. Id. at 1008. It concluded, however, that Sava rigidly categorized aliens as either "documented" or "undocumented" depending upon whether they had been through United States consular screening for a visa. See id. at 1008–09, 1012 & n.15. Noting that under this definition of "documented" the eight Haitians and most of the non-Haitians were "undocumented," the court concluded that with respect to this criterion the petitioners were indistinguishable from the non-Haitians.

The court's finding of rigid categorization is clearly erroneous. Sava testified that while he gave weight to a visa issued by the United States, he also gave weight to an applicant's lesser documentation. See Joint Appendix at 778, 781. Thus it was improper for the court to fail to consider the distinctions between the eight Haitians and the twelve non-Haitians in the degree to which they were documented. Moreover, the court found that the INS had "detailed information about each petitioner" from his own sworn statement contained in his political asylum application and that this self-generated information made the petitioner's lack of documentation virtually irrelevant. 535 F.Supp. at 1015. Had the court not substituted its judgment for that of Sava in determining the nature and importance of the documentation criterion, it might have concluded, on the basis of the record before it, that the petitioners were indeed different from the twelve non-Haitians in this respect.

The District Court recognized also that a second criterion relevant to parole decisions is the "likelihood that [an alien's] immigration application will meet with success," and it thus credited the Government's view of the significance of this criterion. Id. at 1009. It concluded, however, that the likelihood of a successful claim of asylum was not relevant in this case because Sava had stated that petitioners' applications were "serious" and "non-skeletal," id. at 1014; the court thereby implicitly suggested that the test of "seriousness" is synonymous with the question of whether an asylum application is or is not "skeletal." There is no support in the record for this conclusion. Sava did state that the petitioner's applications were not merely "skeletal." However, he never equated (the trial court's suggestions to the contrary notwithstanding) "non-skeletal" applications for asylum with "serious" applications, nor did he indicate that "non-skeletal" applications were sufficiently likely to succeed so as to minimize the risk of absconding. By adopting an unsupported interpretation of one of the Government's stated criteria for deciding parole requests, the court again improperly substituted its own judgment for Sava's judgment. In doing so, it arguably accorded too little weight to the petitioners' asylum applications; the court itself expressly found that Sava's finding that the petitioners were "unlikely to succeed[,]" id. at 1012, "seem[s] to be uncontradicted by the files." Id. at 1013.

The court also addressed the third criterion considered by the INS—whether the alien in question might derive from a family member, in the near future, an "immi-

gration benefit." The court concluded that if an alien's relative is not currently in a position to confer such a benefit, or has not yet acted to confer a benefit, the alien is in no better position than an alien who has no relatives at all in the United States. *Id.* at 1016, n.26. The court discounted the Government's position that the alien was less likely to abscond if he had a relative in the United States who could, in time, pass such a benefit to an alien. If the court had applied the criterion as articulated by Sava, the uncontradicted evidence would have revealed that none of the eight petitioners had any relatives in the United States who are, or in the near future will be, in a position to confer upon them an "immigration benefit." On the other hand, it appears that two of the twelve non-Haitian parolees may have had relatives who will in the near future be able to confer on them an "immigration benefit" and another non-Haitian parolee may have had a relative who is now able to confer a benefit on him.

The District Court considered also another factor noted by the Government in addressing the risk of absconding presented by parole applicants—the identity of the alien's proposed sponsor. The Government presented evidence to support its preference that unadmitted aliens seeking parole obtain sponsorship from members of their family who reside in the United States rather than from large institutions or organizations. In the Government's view, it is easier to keep "track" of aliens whose sponsors are family members because family members generally have only one person to supervise and are more likely to feel personally responsible to keep "track" of the whereabouts of their paroled relative. Accordingly, the Government considers

aliens who have family sponsors to present less of a risk of absconding than do aliens who are sponsored by large institutions or organizations. The trial court recognized that this was the Government's judgment on the matter but concluded that the Government's judgment was in error. *Id.* at 1009. In the court's view, large organizations "appear better structured than individual families" to act as sponsors. *Id.* The court's adoption of its own policy preference may have made the petitioners appear to be less likely to abscond than if the Government's criterion had been applied.

A review of the record convinces us that on several occasions the trial court improperly substituted its own judgment and policy preferences for those of Sava, thereby effectively distorting the case-by-case analysis of the likelihood that each of the petitioners would abscond if paroled and distorting also the comparison of the petitioners with the twelve non-Haitian parolees. Sava's stated criteria were neither irrational nor unreasonable.[16] The court was not empowered to disregard them or to substitute its own policy preferences for those of the official vested by law with discretionary authority to act on requests for parole. *See Johns v. Department of Justice,* 653 F.2d 884, 891 (5th Cir. 1981); 2 Q. Gordon and H. Rosenfield, Immigration Law and Procedure § 8.14 at 8–121 (Rev. ed. 1981).

The court's finding that the petitioners were "indistinguishable" from the twelve non-Haitians with whom the court chose to compare them was the result of its improper substitution of its judgment for that of Sava and therefore is fatally flawed. The finding that the two groups were "indistinguishable" constitutes an essential feature of the conclusion that Sava's decisions on

---

**16.** "Documentation" is relevant on the absconding issue because the existence of valid travel documents permits the INS to determine an alien's identity and it is much more difficult for an accurately identified alien to abscond while paroled. The fact that the petitioners are unlikely to succeed on their immigration applications also suggests that they pose such a risk if paroled; the more likely it is that an alien's application will succeed, the less likely it is that he will abscond while on parole and thereby risk his long-term chances of legal admission to

the United States. The existence of relatives able to confer an "immigration benefit" is relevant to this inquiry because an alien likely to achieve the goal of lawful entry into the United States is less likely to abscond than one whose prospects are more doubtful. The fact that the petitioners have not previously entered the United States is relevant because it precludes the Government from concluding that, based on past experience, the alien will comply with our immigration laws if given the opportunity to do so.

the petitioners' parole requests were not legitimate and bona fide or were the product of invidious discrimination on the basis of race or national origin. Consequently, the petitioners cannot be said to have overcome the presumptive legitimacy of the Government's discretionary decisions.[17]

### III.

*Petitioners' Claims Under the Protocol*

■ The District Court relied upon the Protocol, to which the United States is a party,[18] as an additional basis for its holding that Sava had abused his discretion. It did so without deciding whether the Protocol is a "self-executing" international agreement which directly accords rights to persons without the benefit of Congressional legislation implementing the international obligations embodied in the instrument. *See generally*, L. Henkin, *Foreign Affairs and the Constitution* 156–164 (1972); Restatement (Second) Foreign Relations Law of the United States § 141 (1965).

The leading case on the Protocol concluded that "[t]he history of the adoption of the Protocol by this country makes clear that all the individuals and institutions involved in that process had a continuing belief that the [Protocol] would not alter or enlarge the effect of existing immigration laws, chiefly because it was felt that our immigration laws already embodied the principles of the [Protocol]." *Ming v. Marks*, 367 F.Supp. 673, 677 (S.D.N.Y.1973), *aff'd on opinion below*, 505 F.2d 1170, 1172 (2d Cir. 1974) (per curiam), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1564, 43 L.Ed.2d 776 (1975); *see also Pierre v. United States, supra*, 547

F.2d at 1288–1290 (rejecting the contention of unadmitted Haitian aliens seeking parole "that the Protocol invests them with a liberty right protectable by due process or other constitutional protections," and noting "the intent of Congress in acceding to the Protocol to leave existing immigration procedures intact"). Because the Protocol "[does] not alter or enlarge the effect of existing immigration law," we are required to conclude, for the reasons noted above, that the judgment of the District Court must be reversed.

Only recently we noted *Ming v. Marks, supra*, in a case which concluded that the Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 102, had brought "the [domestic law] definition of refugee . . . into compliance with the Protocol[,]" *Stevic v. Sava*, 678 F.2d 401, 406, 408 (2d Cir. 1982), by changing the domestic law standard governing applications for political asylum. In *Stevic*, we noted that "Article 33 of the Convention imposes an absolute obligation upon the United States," requiring that domestic law "standards developed in an era of discretionary authority [be adjusted,]" *id.* at 406, and that "Congress left no ambiguity about its intention to conform United States domestic law to the Protocol." *Id.* at 409. We also observed a "suggestion" of a "lack of identity" between actual prior domestic legal practice "and what should be expected after accession to the Protocol[.]" *Id.* at 406. In concluding that the Refugee Act of 1980 was designed, at least in part, to bring the United States into compliance with the Protocol, we indicated that the Protocol's provisions were not themselves a source of

---

17. Having erroneously concluded that "petitioners are indistinguishable from aliens paroled by Sava," the District Court, applying by analogy the principles of domestic discrimination cases under the Fifth and Fourteenth Amendments, held that a showing of highly disproportionate discriminatory impact had been made, and that the burden of proof thereupon shifted to the Government "to rebut the presumption of invalidity by showing that the results were reached through racially neutral criteria," which Sava assertedly had not met. Whatever shifting of burden may be permissible in cases based upon the Government's af-

firmative duty not to discriminate in employment and housing, none is permissible here. We are satisfied that the Government is entitled to a broader range of discretion in deciding whether an unadmitted alien should be released on parole. In any event, the present record fails to support the District Court's finding of highly discriminatory impact.

18. *See Ming v. Marks*, 505 F.2d 1170, 1171 n.1 (2d Cir. 1974) (per curiam), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1564, 43 L.Ed.2d 776 (1975) (history of United States accession to Protocol).

rights under our law unless and until Congress implemented them by appropriate legislation.

Accordingly, under the circumstances presented here, the Protocol affords the petitioners no rights beyond those they have under our domestic law.

## IV.

*The Forty-Five Additional Petitioners: The Motion to Amend, the Motion for Class Certification and the Motion for Summary Judgment*

In its opinion of April 5, 1982, the District Court granted the motion of the eight petitioners to amend the petition to add class action allegations covering all other Haitians then detained at the SPC and a motion to certify a class of fifty-three persons as defined in the amended petition. It also granted, on the basis of its March 5, 1982 ruling with respect to the original eight petitioners, a motion for summary judgment in behalf of the newly certified class.

We find no error in the ruling on the motion to amend or on the motion to certify a class of "all Haitian aliens transferred from INS's Krome facility to the SPC on July 18, 1981, who have requested political asylum and parole, but have remained in respondent's custody."

In granting the motion for summary judgment, the court relied on its March 5, 1982 ruling to hold that "the [forty-five] new petitioners are indistinguishable from the original eight" who were the subject of evidentiary hearings and concluded that the forty-five "[were] thus deserving of summary judgment." Inasmuch as we have concluded that the court erred in holding in favor of the original eight petitioners, that holding cannot support the entry of summary judgment in favor of the forty-five additional members of the newly-certified class. However, because the court found that the forty-five new class members are indistinguishable from the original eight petitioners, we leave undisturbed the District Court's certification of the class, without prejudice to its being reopened upon re-

mand in light of the principles set forth herein for guidance of the District Court.

## CONCLUSION

Ordinarily we would reverse and remand the case to the District Court for further proceedings consistent with our decision. However, we have been advised that there have been changes in some of the circumstances bearing directly on whether parole should now be granted, regardless of the INS District Director's past decisions. For instance, orders have apparently been entered denying all petitioners' applications for political asylum and directing that they be deported, subject to appeal to the BIA. In addition, new guidelines have been issued by the INS with respect to the parole of unadmitted aliens. Joint Appendix at 1490–92; letter of June 11, 1982 from Government enclosing Attorney General's memorandum of same date. Since the Attorney General's exercise of discretion, like a court's decision to grant bail in a criminal case, may be affected by a change in current circumstances, it is appropriate that the INS District Director be given the opportunity to reexercise that discretion (which is his and not that of the District Court) in light of *all* of the present relevant circumstances. Moreover, since the case must be remanded, the INS District Director should not be precluded, in the reexercise of his discretion, from taking into consideration the factors referred to in his March 15, 1982 affidavit, which were not introduced until after the District Court's March 5, 1982 decision.

Accordingly, the judgment of the District Court is reversed and the case is remanded with directions to permit the INS District Director to reexercise his discretion in accordance with the foregoing, which may then, upon petitioners' application, be reviewed by the District Court in accordance with the principles set forth in this decision.

KEARSE, Circuit Judge, concurring:

I concur in the result and in the reasoning of the majority opinion, although I have a somewhat different perception as to the

details of some of the district court's analysis. Whereas the majority views the district court as having improperly substituted its own judgment and policies for those of District Director Sava "on several occasions," it appears to me that on some of the occasions referred to the district court was merely making credibility evaluations. Thus, in reviewing some of the factors outlined by Sava as to the likelihood of abscondence, the district court was making an effort to determine whether these were bona fide factors in Sava's own conclusion. This emerged most clearly in the matter of Sava's inclusion of State Department action or inaction as a pertinent factor, which the district court found "disingenuous," 535 F.Supp. at 1014, and in the discussion of documentation in which the court referred to one feature as "the most incredible aspect of Sava's testimony,"[1] *id.* at 1012 n.15.

To the extent that the district court was making credibility assessments, its review was consistent with the strictures of *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). But I agree with the majority that with regard to at least one of Sava's factors—*i.e.*, the preferability of family sponsorship over group sponsorship—the district court did indeed substitute its own judgment and its own weighing of the relevant considerations for those of the District Director; and as to certain other factors, it is not clear from the opinion whether the district court was engaging in an impermissible reevaluation or a permissible assessment of credibility.

Since it is clear that at least to some extent the district court impermissibly substituted its judgments for those of Sava and that these substitutions were essential to the court's conclusion that the 8 Haitians were indistinguishable from the 12 non-Haitians, and thus to the finding of impermissible discrimination, I agree with the majority that the case must be remanded. In that a remand is required, I concur in the re-mand to the District Director for a fresh evaluation of the parole applications in light of the current circumstances.

---

**1.** While recognizing the deference due a district court's evaluations as to a witness's credibility, I agree with the majority that the court's finding here of a rigid categorization by Sava as to the meaning of "documentation" was clearly erroneous, since it ignored portions of Sava's testimony that clearly indicated that he recognized different types or degrees of documentation.